IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JANE DOE (K.B.) | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:22-CV-00226 |
| | § | |
| FACEBOOK, INC. n/k/a | § | |
| META PLATFORMS, INC., | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT[1]

TO THE HONORABLE JUDGE OF SAID COURT:

Comes Now, Jane Doe (K.B.), Plaintiff in the above-styled and numbered cause and files this Second Amended Petition, complaining of Facebook, Inc. n/k/a Meta Platforms, Inc. (hereinafter referred to as "Facebook"), as Defendant, and respectfully shows the Court as follows:

### I. OVERVIEW OF THE LAWSUIT

1.      Facebook, through its products like the social media website Instagram, has knowingly created a breeding ground for human trafficking. Facebook's products, and in particular Instagram, provide a marketplace through which persons are recruited, groomed and sold for sex online. Facebook knows that its products, by and through their affirmative acts, ommissions and design, actively facilitate human trafficking online.

2.      Facebook measures its profits in users and "connections," and the data it collects from those users and connections are used to generate profits. Facebook's technology and

---

[1] While Plaintiff amended her petition in state court prior to Facebook's removal of this action, that amendment was only to add Facebook as a defendant. This is Jane Doe's first amendment related to her claims against Facebook.

algorithms suggest and encourage connections between Instagram users. Facebook's creation of connections between its users is critical to its business model because creating connections increases user engagement with Facebook's products and thereby increases Facebook's profits from advertising to its users.

3.      Facebook promotes connections between its users indiscriminately, even when Facebook serves to connect persons obviously engaged in sex trafficking with vulnerable persons who bear no rational relationship to the traffickers and sex buyers. Facebook thereby connects human traffickers and sex buyers with their victims and provides human traffickers with the means to groom those victims.

4.      Facebook has known since as early as 2012 that they financially benefit from sex trafficking and have knowingly ignored the harmful connections they have created.  In some cases, knowingly turning a blind eye to abuses in order to continue to make profits and not harm their reputation.

5.      In 2016, Facebook executive acknowledged the extensive harm created by its products. In his article "The Ugly," Facebook Vice President Andrew Bosworth circulated alarming comments about the harm caused by Facebook's aggressive growth strategy:[2]

> We talk about the good and the bad of our work often. I want to talk about the ugly. We connect people. That can be good if they make it positive. Maybe someone finds love. Maybe it even saves the life of someone on the brink of suicide. So we connect more people. That can be bad if they make it negative. Maybe it costs a life by exposing someone to bullies. Maybe someone dies in a terrorist attack coordinated on our tools. And still we connect people.
>
> The ugly truth is that we believe in connecting people so deeply that anything that allows us to connect more people more often is *de facto* good. It is perhaps the only area where the metrics do tell the true story as far as we are concerned. That

---

[2] https://www.buzzfeednews.com/article/ryanmac/growth-at-any-cost-top-facebook-executive-defended-data#.upw3jdyR8

isn't something we are doing for ourselves. Or for our stock price (ha!). It is literally just what we do. We connect people. Period.

That's why all the work we do in growth is justified. All the questionable contact importing practices. All the subtle language that helps people stay searchable by friends. All of the work we do to bring more communication in. The work we will likely have to do in China some day. All of it. The natural state of the world is not connected. It is not unified. It is fragmented by borders, languages, and increasingly by different products. The best products don't win. The ones everyone use win.

I know a lot of people don't want to hear this. Most of us have the luxury of working in the warm glow of building products consumers love. But make no mistake, growth tactics are how we got here. If you joined the company because it is doing great work, that's why we get to do that great work. We do have great products but we still wouldn't be half our size without pushing the envelope on growth. Nothing makes Facebook as valuable as having your friends on it, and no product decisions have gotten as many friends on as the ones made in growth. Not photo tagging. Not news feed. Not messenger. Nothing.

In almost all of our work, we have to answer hard questions about what we believe. We have to justify the metrics and make sure they aren't losing out on a bigger picture. But connecting people. That's our imperative. Because that's what we do. We connect people.

6.      By justifying the metrics at all cost and fostering connections even amongst known bad actors, Facebook's products created a marketplace through which victims of human trafficking are sold for sex against their will, without consent.  Human trafficking victims are regularly posted on Facebook's Instagram product and sold into trafficking. The transactions between human traffickers and sex buyers often begin with, and are made possible by, Facebook's Instagram product and its accompanying features. Instagram, therefore, provides a mission critical component for many sex trafficker's operations.

7.      Facebook knows, and has been aware for an unconscionable period of time, that its products provide a platform that actively facilitates and promotes sex trafficking and the sale of sex.

8.      And Facebook has, for some time, knowingly benefitted financially from its involvement in trafficking through its products.  Indeed, Facebook has earned significant profits as a result of organized sex trafficking occurring on Facebook's products through advertisements and increased user engagement.

9.      With its unquenchable thirst to achieve growth at all costs, Facebook failed to take steps that a reasonable and prudent social media company would take to prevent trafficking. Facebook's motivation is obvious: Facebook has not shut down trafficking on its platforms because doing so would reduce its user base, reduce user engagement with its products, and ultimately affect its profits from advertising. Because facilitating sex trafficking through its products improves Facebook's bottom line, Facebook will not stop the sale of human beings through its products absent court intervention.

10.      Instagram's operation as a hub for the recruitment and sale of sex trafficking victims directly injured Jane Doe, who was forced into sex trafficking through Instagram. Jane Doe was initially recruited and groomed through Instagram. Jane Doe was then, on multiple occasions, publically posted for sale on Instagram. The posts selling Jane Doe for sale on Instagram contained obvious indicators of human trafficking that, at the time, had long been widely recognized by law enforcement and trafficking experts. Through these Instagram posts, Jane Doe was sold to sex buyers in Houston and forced to engage in sex acts.

11.      Despite the **open and obvious** trafficking occurring on Facebook's Instagram platform, including the public trafficking of Jane Doe, Facebook continues to take actions that facilitate and make possible the trafficking of victims like Jane Doe because doing so creates profit for Facebook.

12.     The law, however, squarely prohibits such actions. In enacting 18 U.S.C. § 1595, Congress created a beneficiary liability claim that enables victims of sex trafficking and other illegal actions to seek recompense against companies who knowingly benefit from facilitating such illegal activity.  This provision prohibits Facebook from retaining the benefits of facilitating human trafficking through its products. Jane Doe files this lawsuit to hold Facebook accountable for the critical role that it played in facilitating her recruitment and sale into trafficking.

## II.     THE PARTIES

### A.     Plaintiff

13.     Plaintiff Jane Doe (K.B.) was at all relevant times a victim of a violation of the sex trafficking laws set forth in 18 U.S.C. § 1591. Jane Doe is a resident of Florida. Given the nature of these allegations, this complaint identifies Plaintiff as "Jane Doe (K.B.) or Jane Doe" throughout. She may be contacted through her lead counsel, whose information is contained below. There is a collective and compelling interest in keeping Jane Doe's identity anonymous.

### B.     Facebook

14.     Facebook, Inc. ("Facebook") n/k/a META Platforms, Inc. is a foreign corporation, incorporated in Delaware and with its headquarters and principal place of business in California. Facebook can be served through its attorney of record, Collin J. Cox, Gibson, Dunn & Crutcher LLP, 811 Main Street, Suite 3000, Houston, Texas 77002-6117, CCox@gibsondunn.com.

15.     All references to Facebook include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual/implied/apparent authority), employee, person, firm, or corporation acting on behalf of Facebook now or at any relevant time.

### III.    JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) (1) because there is complete diversity between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.  Additionally, the Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

17.    This Court has personal jurisdiction over Facebook because Facebook continuously and systematically does business in Texas.  Facebook has, for years, purposely availed itself of the benefits and protections of the state of Texas and its laws to profit from doing business in Texas. As detailed below, Facebook directly and intentionally transacts business in Texas and has established extensive contacts with Texas as part of its business. Facebook's business and contacts with Texas are substantially related to and give rise to the claims asserted in this case, which stem from Facebook benefiting from the trafficking and sale of persons in Texas through its platforms.

18.    Facebook conducts significant operations in Texas that directly facilitate the delivery, distribution, and operation of Facebook products.

19.    Facebook recently announced its plans to grow its already sizeable Texas presence:[3]

---

[3]  Ellen Glover, *Facebook's Meta Is Growing In Austin, Plans to Hire 400*, Built In Austin, https://www.builtinaustin.com/2022/01/10/meta-new-austin-office-facebook-hiring-400

> Facebook parent company Meta just revealed plans to expand its already sizable presence here in Austin. The social media giant confirmed to Built In on Monday that it has leased half of Sixth and Guadalupe — a new 66-story building that will reportedly be the tallest skyscraper in the city once it is complete in 2023.
>
> A company spokesperson told Built In via email that the new space will measure 589,000 square feet, which is intended to accommodate the more than 400 new employees it plans to hire in the coming months.
>
> "We first came to Austin over 10 years ago with just seven employees, now over 2,000 of us are proud to call Austin home," Katherine Shappley, the head of Meta's local office and VP for commerce customer success, said in a statement shared with Built In. "We're committed to Austin and look forward to growing here together."

20.     The Facebook teams responsible for protecting Instagram users from harm during the time frame in which Jane Doe was trafficked included members based in Texas.

21.     Facebook employs moderators in Texas that perform content moderation work on Facebook's products.

22.     Facebook employs persons on its law enforcement response team and incident response teams, which are responsible for responding to inappropriate interactions with children on Facebook's platforms, including Instagram. Facebook has members of these teams in Texas and did during the time of Jane Doe's trafficking.

23.     Facebook generates revenue from its business in Texas.

24.     Facebook tracks the use of its products in Texas through metrics that include Daily Average Users (DAUs) and Monthly Average Users (MAUs).

25.     Facebook has earned billions of dollars from the use of its products in Texas.

26.     Facebook is registered to do business in Texas. Its business in Texas is online social networking through its products, including Instagram:

6. The purpose or purposes of the corporation that it proposes to pursue in the transaction of business in Texas are set forth below. The corporation also certifies that it is authorized to pursue such stated purpose or purposes in the state or country under which it is incorporated.

ONLINE SOCIAL NETWORKING

27.     Facebook has a registered agent for service in Texas.

28.     Facebook's business in Texas is providing its products in Texas for commercial purposes.

29.     Facebook has millions of users in Texas.

30.     Facebook is in the business of designing and building products.

31.     Facebook provides products to users in Texas.

32.     Facebook's products include Instagram.

33.     Facebook places its products in the stream of commerce, including in Texas.

34.     Facebook targets Texas as a marketplace for its products, including but not limited to Instagram.

35.     Facebook intends for Texas consumers to use its products.

36.     In furtherance of its business in Texas, Facebook has multiple offices and properties in Texas.

37.     Facebook has a data center in Texas that is involved in the delivery and distribution of its products.

38.     Facebook collects data on its users, including their geographic location.

39.     Facebook collects data on users of its products in Texas.

40.     Facebook has received millions of dollars in economic incentives from Texas governmental bodies by placing facilities in Texas.

41.     All of Facebook's numerous Texas contacts are related to the use of, and profiting from, its products.  Jane Doe's claims stem from Facebook profiting from the use of its products to facilitate sex trafficking.

42.     Minors have been sexually exploited through Facebook on multiple occasions in Texas.

43.     Facebook has reported instances of child abuse occurring in Texas to the National Center for Missing and Exploited Children (NCMEC).

44.     Facebook has reported instances of sexual assault of a child occurring in Texas to the NCMEC.

45.     Facebook has reported instances of child human trafficking occurring in Texas to the NCMEC.

46.     Facebook has responded to Texas law enforcement subpoenas regarding the trafficking of minors in Texas.

47.     Facebook has provided information to Texas law enforcement agencies regarding the trafficking of minors in Texas.

48.     Facebook has monitored content on Facebook regarding the sexual exploitation of minors in Texas.

49.     Facebook has monitored the content on Facebook regarding the human trafficking of minors in Texas.

50.     Facebook has accessed user information of Texas residents.

51.     Facebook has accessed user information of Texas residents and provided that information to third party marketing companies.

52.     Facebook has responded to civil subpoenas from law firms in Texas regarding Facebook users in Texas.

53.     Facebook has reviewed messages on Facebook sent and received by Texas-based users.

54.     Facebook has blocked Texas-based users on Facebook for sharing explicit content, including that involving the sexual exploitation of minors.

55.     Child pornography has been exchanged via Facebook users in Texas.

56.     Facebook has pulled down child pornography from Facebook users in Texas.

57.     Facebook has investigated the sexual exploitation of minors in Texas on Facebook.

58.     Facebook has investigated the human trafficking of minors in Texas on Facebook.

59.     Facebook has sought protection from Texas courts regarding responses to subpoenas issued in civil lawsuits involving Texas residents.

60.     Facebook has sought protection from Texas courts regarding responses to subpoenas issued in criminal proceedings in Texas.

61.     Facebook has millions of users in Texas on the Facebook and Instagram platforms.

62.     Facebook sells information collected by Texas residents to third party vendors.

63.     Facebook targets customers in Texas.

64.     Facebook targets businesses in Texas.

65.     Facebook employs hundreds of people in Texas.

66.     Facebook targets potential employees in Texas.  These include, but are not limited to, managers, moderators, accountants, design specialists, IT support, lawyers, clerks, receptionists, financial advisors, insurance companies, sanitation engineers, purchasing agents,

leasing agents, human resources specialists, and other employees who are integral to Facebook's operations throughout Texas and the United States.

67.     Facebook has employees responsible for operational support of Facebook's products in Texas.

68.     Facebook hires employees from Texas who reside in Texas.

69.     Facebook fires employees from Texas who reside in Texas.

70.     Facebook targets investors in Texas.

71.     Facebook has investors who live in Texas.

72.     Facebook has retained attorneys who reside in Texas.

73.     Facebook currently has employees who are from and reside in Texas.

74.     Facebook signs contracts with Texas businesses.

75.     Facebook sends advertisements to Texas customers and advertises its services to Texas customers.

76.     Facebook has spent millions of dollars in specifically marketing to Texas customers.

77.     Facebook pays taxes in Texas.

78.     Facebook derives substantial revenue from Texas.

79.     Facebook has trademarks that it enforces in Texas.

80.     Facebook has hired independent contractors in Texas.

81.     Facebook has ultimate control over its products, including Instagram.

82.     Facebook's products, including Instagram, are accessible in Texas.

83.     Facebook generates profits from the use of its Instagram product in Texas.

84.     Facebook facilitated the trafficking of Jane Doe and other minors in Texas on Facebook and Instagram.

85.     Facebook received payment for goods and services from banks in Texas.

86.     Facebook makes payments to banks in Texas.

87.     Facebook has the ability to limit the use of its produts by geographical location. Therefore, if Facebook did not want its Instagram product to be used in Texas, it could restrict access by Texas users.

88.     Facebook's Texas contacts are substantially related to Jane Doe's claims such that specific jurisdiction is proper.

89.     Jane Doe's claims against Facebook stem directly from her sex trafficking through Facebook's Instagram product in Texas.

90.     Jane Doe was trafficked through Facebook's Instagram platform and sold for sex in Texas to sex buyers in Texas.

91.     Facebook's continuous and systematic Texas contacts are of such a nature and degree that Facebook is "essentially at home" in Texas, which subjects Facebook to general jurisdiction in Texas.

92.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1391(a), (b), and (d).

93.     Jane Doe was trafficked in this District and Division.

## IV.     ASSUMED OR COMMON NAME

94.     Jane Doe brings this petition against each Defendant in their assumed or common name and expressly reserves the right to substitute the true name of any Defendant if needed or in response to Court Order. Moreover, Jane Doe expressly invokes the right to amend under the doctrine of misnomer if the Defendant has been properly served but were done so under the wrong legal name.

95.     Jane Doe (K.B.) brings this name under a pseudonym to protect her from her traffickers, johns, and others who pose a serious, imminent risk to her safety if her name is revealed.

## V.     CONDITIONS PRECEDENT

96.     All conditions precedent to the filing of this lawsuit have been performed or have occurred.

## VI.     FACTUAL ALLEGATIONS

**A.     Sex trafficking has reached epidemic proportions in the United States as a direct result of the internet and the rise of social media companies like Facebook.**

97.     Human trafficking is a public health crisis that has reached epidemic proportions. Sex trafficking comprises a significant portion of overall trafficking and the majority of transnational modern-day slavery.  There are an estimated 4.8 million victims of sex trafficking worldwide, with the United States leading all other nations in driving demand.[4]  And it is estimated that there are more than 300,000 victims of human trafficking in the State of Texas, and nearly 80,000 of those are identified as minors.[5]  Human trafficking earns profits of roughly $150 billion per year, with two-thirds of these dollars resulting from sexual exploitation of the victims.[6]

98.     The number of human trafficking victims has grown exponentially in recent years.[7] Historically, sex trafficking and prostitution took place out on the street. Now, most sex trafficking, including the trafficking of Jane Doe, occurs online. Online exploitation of victims has transformed the commercial sex trade and, in the process, has contributed to the explosion of domestic sex

---

[4] U.S. Institute Against Human Trafficking, https://usiaht.org/.
[5] Tex. H.R. Con. Res. 35, 86th Leg. R.S.
[6]     *Human     Trafficking     by     the     Numbers*,     Human     Rights     First     (2017), https://www.humanrightsfirst.org/sites/default/ files/TraffickingbytheNumbers.pdf.
[7] Tex. H.R. Con. Res. 35, 86th Leg. R.S.

trafficking. Social networks and online-classified sites are being used by traffickers to market, recruit, sell, and exploit victims for criminal purposes. The internet and other modern technologies give traffickers the unprecedented ability to exploit a greater number of victims and advertise their services across geographic boundaries.[8] These technologies impact various aspects of trafficking, from grooming, recruitment, and control of victims to advertising, movement, and financial transactions.[9] With the development of modern technology, pimps and traffickers can reach entirely new audiences, evade law enforcement detection, and maintain control of victims by transporting them quickly between locations thus maximizing profits far beyond traditional trafficking methods.

99.    Criminal human traffickers recognize that the success of their enterprises often depends on their affiliation with or use of otherwise legitimate businesses. Traffickers need the technology provided by these businesses to operate, and they have found many businesses that will assist them as long as they can profit from doing so.[10] These businesses—including social media companies—affirmatively facilitate, assist, and support sex trafficking ventures and have participated in the significant expansion of sex trafficking in recent years.

---

[8] Mark Latonero et al., *Human Trafficking Online: The Role of Social Networking Sites and Online Classifieds*, University of Southern California (2011), https://technologyandtrafficking.usc.edu/files/2011/09/HumanTrafficking_FINAL.pdf.

[9] Mark Latonero et al., *The Rise of Mobile and the Diffusion of Technology-Facilitated Trafficking*, University of Southern California (November 2012), https://technologyandtrafficking.usc.edu/files/2012/11/HumanTrafficking2012_Nov12.pdf.

[10] *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking*, The Polaris Project (2020), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking.pdf.

**B.    Facebook knowingly benefits from facilitating human trafficking on its Instagram platform.**

100.    Facebook has long been aware that sex trafficking and the sale of illegal sex is rampant on its products, particularly its Instagram product.  Facebook's Instagram platform has given sex traffickers an unrestricted platform to stalk, exploit, recruit, groom, and sell victims into human trafficking.

101.    Although Facebook knows of the sex trafficking problem on Instagram, and has claimed to be taking action to combat trafficking, Facebook's anti-trafficking efforts are not only nominal, but sex trafficking is intentionally ignored.

102.    In reality, Facebook has little vested interest in prohibiting sex trafficking through its products.

103.    Instead of preventing human trafficking through its products, Facebook has knowingly served as a marketplace for human trafficking. Indeed, internal Facebook documents confirm its prominent role, and the role of its products including Instagram, in organized criminal sex trafficking, as demonstrated by the following from Facebook's "2019 Case Briefs and Insights Report" on how human traffickers and criminal networks use Facebook and its products to facilitate sex trafficking:[11]

---

[11] https://www.wsj.com/articles/facebook-drug-cartels-human-traffickers-response-is-weak-documents-11631812953



Source: 2019 'Case Briefs and Insights report' on how human traffickers and criminal networks use Facebook platforms

104.    Facebook assists and ventures with the sex traffickers who operate through its products. Facebook plays an integral role in facilitating online sex trafficking by providing and maintaining the Instagram product in a manner that  enables sex traffickers to sell their victims.

105.    Likewise, Instagram is responsible for creating many of the connections between victims, traffickers, and sex buyers that lead to the ultimate sale of victims through Instagram.

106.    Facebook collects data on its users' activities through its products, including information about their contacts, group associations, and the content that its users post and interact with. Facebook collects and buys detailed information about its users so that it can, among other things, direct users to persons that Facebook thinks they likely want to meet. By employing proprietary algorithms, Facebook's products generate targeted recommendations to its users, including recommendations about other users they should know.

107.    This technology, however, has served to create connections between sex traffickers and their victims that otherwise would never have existed. Facebook's Instagram product promotes and facilitates connections between sex traffickers and their victims, connections which provide

sex traffickers with a steady stream of victims to be sold through Instagram.  In doing so, Facebook facilitates human trafficking by identifying potential victims, like Jane Doe, and connecting traffickers with those individuals.

108.    Facebook knows that it provides a critical link in the sex trafficking chain, and benefits from doing so through selling advertisements on pages that promote sex trafficking and sell sex trafficking victims.

109.    Further, Facebook knows that it increases user engagement and time spent on its products like Instagram—thereby increasing advertising revenue—when it promotes and facilitates connections between all parties involved in sex trafficking operations ran through Instagram (e.g., traffickers, persons who recruit victims into sex trafficking, sex buyers, and the victims themselves).

**C.    Jane Doe (K.B.) was trafficked and publicly sold for sex on Instagram.**

110.    In July 2017, Jane Doe was contacted on Instagram by R.L., a man who was previously unknown to her and had no relationship to her.

111.    R.L. began to send messages to Jane Doe through Instagram's direct message chat feature and posted statements to Jane Doe on her public Instagram screen. R.L.'s messages and public posts on Instagram employed recognized grooming techniques that traffickers often use to lure victims.

112.    Facebook was aware of the signs of trafficking and the sale of victims as early as 2012 and circulated internal communications documenting these issues.

113.    Facebook knew that sex trafficking was a rampant problem on its Instagram platform. And Facebook had and was employing technology to scan user messages, including to scan for established signs of grooming and human trafficking.  Although Facebook had the ability

to detect messages that showed signs of sex trafficking, Facebook did not flag or pull down the grooming messages that R.L. had sent to Jane Doe and had publicly posted.

114.    R.L. continued sending direct messages to Jane Doe and making public posts on her Instagram page in order to gain her trust. Eventually, R.L. suggested that Jane Doe meet him in person.

115.    Within two days of their first in person meeting, R.L. began to traffic Jane Doe for sex on Instagram. R.L. promised Jane Doe that, if she worked for him, they would be in a relationship, they would live lavishly, and they would start a family.

116.    Shortly after R.L. and Jane Doe met, R.L. publically posted photos of Jane Doe on Instagram.  The postings publically and obviously advertised Jane Doe for sale for sex.

117.    The advertisements contained photos of Jane Doe with another victim posing suggestively in a hotel bathroom. Additionally, the advertisements include other signs of trafficking, including the of emojis such as lips, squirting water, and currency that are known to Facebook as indications of the selling of sex and sex trafficking.

118.    Jane Doe's photos were posted alongside several other victims, all of whom were publically being sold for sex.

119.    The postings on Instagram through which Jane Doe was sold contained obvious signs of human trafficking that would be easily recognizable by law enforcement and trafficking experts. For example, the posts advertising Jane Doe for sale contained emoticons of dollar signs, crowns, and roses, which are well-known code conveying that the person pictured is being sold for sex. Facebook knew that the use of this code was a blatant red flag that the posts involving Jane Doe were actually sex trafficking advertisements designed to sell her for sex, but Facebook did nothing to remove or prevent those repeated posts, despite having the ability to do so.

120. Even though Jane Doe and other victims were being openly sold for sex on Instagram, Facebook allowed the sales to continue unabated on its Instagram platform because taking action to limit its customers' ability to use its products would decrease user engagement with Instagram, engagement with advertisements, and Facebook's profits.

121. Facebook knew that Jane Doe was an Instagram user.

122. Facebook knew that Jane Doe was being trafficked and sold for sex through Instagram because the postings selling her for sex were on Facebook's Instagram product and were public, open, and obvious and contained unmistakable evidence of human trafficking as described above.

123. Facebook knows fake user accounts are commonly used by sex traffickers and have acknowledged this problem in internal documents. Facebook does not remove or screen fake user accounts for signs of criminal activity due to the likelihood of having to disqualify the user that will result in revenue loss.

124. Jane Doe's trafficker's Instagram account was under a fictious name. All of the advertising accounts used to sell Jane Doe for sex were fake user accounts.

125. R.L. forced or coerced Jane Doe to perform sex acts in exchange for money from sex buyers, who contacted R.L. through Instagram in response to his postings offering to sell Jane Doe.

126. R.L. told Jane Doe that if she did not meet sex buyers and make enough money to meet his quota, she would be prohibited from returning home and would have to stay on the street until she met her quota.

127. R.L. threatened to beat Jane Doe if she did not participate fully in his sex trafficking enterprise.

128.     Between July 2017 to July 2018, Jane Doe, was repeatedly sold for unlawful sex acts through Instagram in Houston, Texas and was assaulted by numerous men.

129.     The advertisement and trafficking of Jane Doe was openly executed through Instagram.

130.     The trafficking of Jane Doe was made possible and facilitated by Facebook, who directly profited from her trafficking, and by Facebook's technology and Instagram product.

131.     Facebook's Instagram platform formed an integral part of the illegal enterprise through which Jane Doe was trafficked. Facebook's actions thereby facilitated and caused the trafficking of Jane Doe through its Instagram platform.

132.     Jane Doe suffered significant physical and emotional injuries as a result of the trafficking complained of herein.

133.     Jane Doe ultimately testified against R.L. in a federal criminal trial in the Southern District of Texas, where R.L. was convicted of sex trafficking crimes and sentenced to 40 years in prison.

134.     As of the filing of this complaint, even with the Instagram of the trafficker being subpoenaed and used in the criminal trial and the trafficker being in prison for several years, Instagram has not removed the trafficker's Instagram.

## VII.     CAUSE OF ACTION AGAINST FACEBOOK

### VIOLATION OF 18 U.S.C. § 1595

135.     Jane Doe incorporates each foregoing allegation.

136.     Jane Doe is a victim of sex trafficking under 18 U.S.C. §§ 1591 and 1595, as she was forced or coerced into performing commercial sex acts. Jane Doe's trafficker, R.L., was convicted of sex trafficking crimes.

137.     Facebook violated the civil anti-trafficking statute under 18 U.S.C. § 1595(a), which provides that:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

138.     Thus, to bring a civil claim under Section 1595, the defendant must have knowingly benefitted from participating in a venture which that person knew or should have known was engaged in an act in "violation of this chapter."

139.     The relevant "violation of this chapter" by the venture in this case is a violation of the criminal anti-trafficking provision found in 18 U.S.C. § 1591, which states:

> (a)Whoever knowingly—
>
> (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

140.     Facebook had a duty not to knowingly benefit from trafficking of persons, including Jane Doe.

141.     Facebook breached this duty by knowingly receiving financial benefits from facilitating the sex trafficking of Jane Doe and others through Instagram, including by:

a.  Creating and maintaining a breeding ground for sex trafficking and the sale of illegal sex on Instagram, knowing of the prevalence of trafficking on Instagram;

b.  Knowingly assisting and facilitating sex traffickers in connecting with their intended victims and in selling and advertising their victims through Facebook's Instagram product, including facilitating the sale of Jane Doe;

c.  Providing a marketplace through Instagram for the sale of sex trafficking victims online;

d.  Enabling the sale of Jane Doe through the Instagram platform, which played an integral and necessary role in her trafficking and injury;

e.  Providing products and features through Instagram that facilitate the sale and advertisement of sex trafficking victims online;

f.  Creating, suggesting, and encouraging connections between sex traffickers and vulnerable persons on Instagram, effectively creating a pipeline of victims to be sold for sex by traffickers on Instagram;

g.  Recommending that vulnerable persons become Instagram "friends" with sex traffickers;

h.  Raising advertising fees by extending its "user base" to include sex traffickers;

i.  Maximizing user engagement, user numbers, advertising revenue, and profits by allowing sex traffickers to use Instagram as a forum to sell their victims;

j.  Participating in a venture that trafficked Jane Doe and others through helping traffickers connect with, advertise, and sell trafficking victims on Facebook's Instagram product;

k.  Permitting the open and obvious human trafficking of Jane Doe and other victims, whose trafficking was occurring publicly on Facebook's own product;

l.  Failing to ban sex traffickers from using and posting on Instagram, despite knowing that the content of the traffickers' posts involved the sale of victims for sex;

m.  Increasing profit margins as a result of continued customer loyalty and therefore increased "user" numbers used to extract higher advertiser fees by creating a breeding ground for sex traffickers to stalk and entrap survivors;

    n.    Increasing profit margins and lowering operating costs by failing to take any reasonable steps to abate human trafficking on its platforms, including

        1.    not implementing safeguards requiring verification of the identity of all user's on Instagram;

        2.    not using advertising space for public service announcements or awareness campaigns regarding the dangers of entrapment, grooming, and recruiting methods used by sex traffickers on Instagram

        3.    not implementing mandatory public service announcements for those who sign up for Instagram regarding the dangers of entrapment and grooming used by sex traffickers on Instagram;

142.    Facebook has knowingly received significant benefits as a result of these acts and omissions to facilitate the sale of sex trafficking victims through Instagram. By allowing Instagram to operate as a breeding ground for sex trafficking, Facebook increased the user base of Instagram and increased its advertising revenue as sex traffickers use Instagram to sell victims and sex buyers visit Instagram to purchase persons for sale.  Facebook's profit model stems from advertising and thus the maintenance and growth of its user base is critical to Facebook's ability to continue to profit.

143.    Facebook knew, or at minimum should have known, that the sex traffickers using its platform were engaged in criminal trafficking activity and that it was actively assisting those traffickers by helping them connect with victims and providing a marketplace for them to advertise and sell their victims.

144.    Facebook knew, because it was posted publicly on Facebook's own Instagram product, that Jane Doe and other victims were being trafficked through the product and were being openly sold for sex on the product.

145.    Facebook therefore had actual and constructive knowledge of a venture involving violations of human trafficking laws operating through Instagram.

146.     The evidence in this case will show that, without the technology that Facebook provided to traffickers through its Instagram product and associated features, the ability of traffickers to effectively sell their victims (including Jane Doe) would have been destroyed or, at minimum, severely diminished.

147.     At all points, Facebook chose to maximize profits, to facilitate trafficking through Instagram, and to turn a blind eye to the human trafficking victims whose sexual exploitation began on Instagram, including Jane Doe.

### VIII.     <u>DAMAGES</u>

148.     Jane Doe adopts and re-alleges each paragraph above as if set forth herein.

149.     Facebook's acts and omissions caused Jane Doe to sustain legal damages.

150.     Jane Doe is entitled to be compensated for personal injuries and economic damages, *see, e.g.*, 18 U.S.C. §§ 1593, 1595, including:

  a.   Actual damages

  b.   Direct damages

  c.   Incidental and consequential damages

  d.   Mental anguish and emotional distress damages (until trial and in the future)

  e.   Restitution

  f.   Unjust enrichment

  g.   Disgorgement of profits

151.     Plaintiff is entitled to pre- and post-judgment interest at the maximum legal rates.

152.     A constructive trust should be imposed on Facebook and the Court should sequester any benefit or money wrongfully received by Facebook for the benefit of Plaintiff.

## IX.   PUNITIVE DAMAGES

153.   Jane Doe is entitled to punitive damages under the applicable statutes against Defendants as a result of their outrageous, wanton, willful, reprehensible, and malicious conduct underlying Jane Doe's claim.  *See, e.g.*, *Alfaro v. Gandy*, No. CV H-18-1761, 2019 WL 1789587, at *1 (S.D. Tex. Apr. 24, 2019).

## X.   ATTORNEYS' FEES

154.   Plaintiff is entitled to recover its costs and reasonable, necessary, or customary attorneys' fees from Defendants under the applicable statutes.  *See* 18 U.S.C. § 1595(a).

155.   All conditions precedent to Plaintiff's recovery of its costs and attorneys' fees have occurred, or will occur prior to entry of judgment in this suit.

## XI.   JURY DEMAND

156.   Jane Doe requests a jury trial in this action.

## XII.   PRAYER

For these reasons, Jane Doe prays that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Jane Doe and against Facebook for:

    a.  All economic damages to which she is entitled;

    b.  All actual damages to which she is entitled;

    c.  All incidental and consequential damages to which she is entitled;

    d.  All mental anguish and emotional distress damages to which she is entitled;

    e.  All disgorgement of profits to which she is entitled;

    f.  All unjust enrichment damages to which she is entitled;

    g.  Exemplary, treble, and/or punitive damages;

    h.  Attorneys' fees and costs of suit;

    i.  Pre-judgment and post-judgment interest at the highest rate allowed by law; and

j.   All other relief to which she is entitled in law or in equity.

Respectfully submitted,

By:   */s/ Annie McAdams*

**ANNIE MCADAMS PC**
**Annie McAdams**
Texas Bar No. 24051014
1150 Bissonnet
Houston Texas 77005
Phone: 713-785-6262
Fax: 888-713-0451
annie@mcadamspc.com
   and
**SICO HOELSCHER HARRIS, LLP**
**David E. Harris** | SBN 24049273
**Jeffrey H. Richter** | SBN 24061614
802 N. Carancahua, Suite 900
Corpus Christi, Texas 78401
(361) 653-3300
(361) 653-3333 Facsimile
dharris@shhlaw.com
jrichter@shhlaw.com
bgilde@shhlaw.com
   and
**THE GALLAGHER LAW FIRM**
**Michael T. Gallagher**
Texas Bar No. 07586000
**Pamela McLemore**
Texas Bar No. 24099711
2905 Sackett Street
Houston, Texas 77098
Phone: 713-222-8080
Fax: 713-222-0066
mike@gld-law.com
pamm@gld-law.com

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of March, 2022, a copy of the above document was served on all counsel of record via the Court's CM/ECF system.

*s/ Annie McAdams*
Annie McAdams